| | |
|---|---|
| JANICE PEETE-BEY <br> 316 E Chatsworth Avenue <br> Reisterstown, Maryland 21136 <br><br> Plaintiff <br><br> v. <br><br> EDUCATIONAL CREDIT <br> MANAGEMENT CORPORATION <br> C/O Dave Hawn, President <br> 1 Imation Place <br> Oakdale, MN 55128 <br><br> Defendant | IN THE <br><br> CIRCUIT COURT <br><br> FOR <br><br> BALTIMORE CITY <br><br> CASE NO._____ |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Janice Peete-Bey, by and through her attorneys, Jane Santoni, Kathleen P. Hyland, and Williams & Santoni, LLP, hereby files this action against the Defendant, Educational Credit Management Corporation ("ECMC" or "Defendant"). The Plaintiff alleges and states:

### PARTIES

1. The Plaintiff, Janice Peete-Bey ("Ms. Peete-Bey" or "Plaintiff"), formerly "McHenry-Bey," is a resident of Maryland, a natural person, and a "consumer" as defined in 15 U.S.C. § 1692a(3) of the FDCPA.

2. The Defendant ECMC is a federal guaranty agency with many state offices, including Virginia, Oregon, and Minnesota. In this matter, ECMC is an assignee of the original lender, Crestar Bank. Federal courts have held that ECMC is a debt collector under 15 U.S.C.A. § 1692a(6) of the Fair Debt Collection Practices Act ("FDCPA") when, as in this case, the alleged debt was assigned to ECMC by a different guarantor and it acted as a collection agent. ECMC is also a debt collector as defined by the Maryland Consumer Debt Collection Act, MD. CODE ANN., COM. LAW § 14-201(b) ("MCDCA").

3. The PSI Institute ("PSI"), not a party to this dispute, was a for-profit vocational training program that offered computer and data entry skills, which was owned by a private company, Programming and Systems Incorporated. PSI was located at 300 W. Lexington Avenue, Baltimore, Maryland 21201, as well as other locations throughout the country, and closed in 1991.

## JURISDICTION AND VENUE

4. Jurisdiction of this Court arises under MD. CODE ANN., CTS & JUD. PROC. § 6-103(b), because ECMC transacts business and performs work and provides services in Maryland, regularly does and solicits business in Maryland, and engages in other persistent courses of conduct in Maryland.

5. Venue in this Court is proper under MD. CODE ANN., CTS & JUD. PROC. § 6-201 because the Defendant regularly transacts business within Baltimore City. Furthermore, the cause of action for the underlying alleged debt arose in Baltimore City.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

6.  On or about August 28, 1989, Ms. Peete-Bey, who was twenty-one years old, was pushing her daughter's stroller through Lexington Market in Baltimore City, Maryland when a young, male recruiter handed her a flier and asked her to sign up for classes at PSI.

7.  On or about August 28, 1989, Ms. Peete-Bey signed up to attend classes at PSI on a part-time basis and signed paperwork to enroll in the school.

8.  On or about August 28, 1989, Ms. Peete-Bey signed student loan promissory notes to finance her education at PSI.

9.  Crestar Bank was the original lender of the promissory notes, and PSI performed all of the student loan transactions related to Ms. Peete-Bey's educational financing at PSI.

10.  According to records held by the Maryland Higher Education Commission ("MHEC"), the total cost of Ms. Peete-Bey's vocational training program was $5,859.50. She enrolled to attend computer programming classes in a computer and data skills program that ran from September 1989 and April 1990. See Exhibit 1, "Student Application and Refund Policy."

11.  Between August 29, 1989 and November 1, 1989, Ms. Peete-Bey attended classes at PSI at 300 W. Lexington Avenue, Baltimore, Maryland 21201.

12.  Upon information and belief, PSI professors often did not attend their classes and the atmosphere was more like a "hang out spot" than a school. Many of the students were recruited from the local foot traffic.

13. PSI also regularly enrolled students who had not finished high school, did not have a GED, and did not take an entrance exam.

14. Ms. Peete-Bey, who worked to support her daughter, took the bus across town to attend classes. When she arrived, there were no professors, the other students just hung out and talked, and she did not receive any instruction or lessons. After a few weeks of feeling like PSI was a waste of her time and causing her a hardship to attend, Ms. Peete-Bey stopped attending classes and dropped out of PSI on or about November 1, 1989.

15. Upon information and belief, Ms. Peete-Bey never received any grades, credits, certifications, or diplomas from PSI.

16. According to MHEC records, PSI had a refund policy for students who dropped out before completing their coursework. Based on this policy, Ms. Peete-Bey would have been eligible for a refund of at least 60% of her tuition, if not more. *See* Exhibit 1.

17. The MHEC records show that PSI officials handwrote the date "3/28/1990" for Ms. Peete-Bey's last date of attendance. *See* Exhibit 2, "Student Record Card."

18. The MHEC records also show that PSI officials noted that they had applied for Pell Grants in Ms. Peete-Bey's name, which she never completed or received.

19. According the MHEC records, PSI received at least two Pell grants *after* Ms. Peete-Bey dropped out: one on 1/1/1990 for $864.00 and another on 4/1/1990 for $861.00, totaling $1,725.00. See Exhibit 3, "Pell Grant Checks."

20. In September 1989, Ms. Peete-Bey received a check for approximately $2,000 with PSI's name on it. When she tried to cash it, she was told that she also needed PSI's signature. Ms. Peete-Bey brought the check to an administrator at PSI, who kept it and never gave her any of the funds.

21. The MHEC records also show that PSI applied for transportation aid, which Ms. Peete-Bey never received. See Exhibit 4, "Handwritten Records."

22. The MHEC records also show that applications for student loans for the 1989 and 1990 terms were submitted together, even though Ms. Peete-Bey did not attend classes in 1990.

23. The MHEC records also show that there are three Promissory Notes in Ms. Peete-Bey's name. Two of these are for "SLS" loans. Upon information and belief, one was submitted with an incorrect social security number. Notes from PSI officials state that an incorrect social security number was "indicated on 1st SLS application. 2nd SLS application submitted with copy of SS Card." See Exhibit 4.

24. In 1993, the CEO of PSI, Irwin Mautner, pled guilty to several counts of fraud. According to *U.S. v. Mautner*, 172 F.3d 874 (1999), Mr. Mautner admitted that he committed fraud by "deceiving the Department of Education and accrediting agencies as to the actual rate of student withdrawals." In

addition, Mr. Mautner "deliberately underreported the dropout rate in order to keep PSI's accreditation and thus to retain its status as an institution eligible for financial aid." See Exhibit 5, U.S. v. Mautner, 172 F.3d 874 (1999).

25. Based on the testimony of former PSI employees, students, and managers, the district court expressly found that in some instances, PSI "targeted for recruitment individuals who were unemployed and economically disadvantaged. Many of these individuals did not have the ability to complete the coursework and were not motivated to come to school for an education. They were targeted for recruitment because they were eligible for financial aid."

26. According to ECMC, Ms. Peete-Bey originally took out a Stafford loan in the amount of $2,625.00 and a Supplemental loan of $4,000.00, which exceeded the cost of attendance. These loans were originally guaranteed by the Maryland Higher Education Loan Corporation (MHELC). See Exhibit 6, "ECMC Letter from 12/13/13."

27. According to ECMC, these loans were disbursed on four dates, three of which occurred after Ms. Peete-Bey dropped out of PSI:

   a. **Loan #03** – "GSL Subsidized" in the amount of $1,313.00 was disbursed on 09/06/1989, while Ms. Peete-Bey was still attending classes at PSI.

   b. **Loan #05** – "SLS Supplemental" in the amount of $2,000.00 was disbursed on 12/19/1989, after Ms. Peete-Bey had dropped out of PSI.

  c. Loan #02 – "GSL Subsidized" in the amount of $1,312.00 was disbursed on 01/01/1990, after Ms. Peete-Bey dropped out of PSI.

  d. Loan #04 – "SLS Subsidized" in the amount of $2,000.00 was disbursed on 01/01/1990, after Ms. Peete-Bey dropped out of PSI.

See Exhibit 7, "11/29/11 Letter from ECMC."

28. The federal loans plus the Pell grant amounts total $8,349.00, which exceeds the cost of attendance listed on Ms. Peete-Bey's Student Application and Refund Policy by $2,489.00.

29. According to MHEC records, on or about May 1, 1990, (around the same time that PSI schools were starting to close and were possibly being investigated by the SEC), PSI sent Crestar bank, the original lender of the Peete-Bey loans, a refund check for $1662.91. Subtracting this amount from the total amount PSI took out in Ms. Peete-Bey's name of $8,349.00 equals $6,686.09, which means that Ms. Peete-Bey was still overcharged a minimum of $826.59, without taking into considering the unpaid refund she is owed under the PSI refund policy.

30. According to ECMC, Ms. Peete-Bey's loans entered repayment on September 28, 1990. At that time, Ms. Peete-Bey did not know that she owed PSI anything after attending for such a short time, and had no notice of the additional funds PSI withdrew in her name. The loans defaulted, and MHELC paid default

claims on both the Stafford and Supplemental loans to the original lender, Crestar Bank.

31. According to ECMC, when MHELC closed on June 30, 1995, the loans transferred to United Student Aid Funds ("USAF") on July 1, 1995. USAF transferred the loans to the Department of Education on an unknown date. The balance of the loans on this date was $5,640.45. Between 1995 and 1998, the Department of Education allegedly collected $862.63, which it applied to interest and fees.

32. According to ECMC, the Department of Education then transferred the loans to ECMC on January 28, 1998 because Ms. Peete-Bey filed for bankruptcy. The balance at this time was still $5,640.45.

33. For reasons unknown to the parties, her bankruptcy was not approved.

34. Between 1998 and January 1, 2006, ECMC did not collect any money from Ms. Peete-Bey, and interest and collection fees accrued.

35. Prior to 2000, Ms. Peete-Bey did not know that she allegedly owed any money for her student loans. Ms. Peete-Bey lived below the poverty line, and had garnishments for other debts, and did not know that the student loan collectors were also potentially garnishing her accounts. PSI had closed and she had not received any information from PSI after dropping out.

36. In 2000, she received a letter from ECMC stating that she owed principal, interest, and collection fees on the PSI student loans.

8

37. In 2004, Ms. Peete-Bey filed a Chapter 7 bankruptcy that was granted. She received a telephone call from a male representative from ECMC, who informed her that she still had to pay back the PSI student loans, and that he would contact her again in six months.

38. Between 2006 and January 1, 2008, ECMC intercepted and offset Ms. Peete-Bey's federal tax returns and garnished her wages. Ms. Peete-Bey did not know that ECMC was the garnishee and thought the taxes were intercepted to pay off outstanding Maryland Motor Vehicle Administration fines.

39. Upon information and belief, and based on statements from ECMC, between 2008 and January 1, 2012, ECMC did not receive any payments on the account, and interest and fees accrued.

40. In September 2011, ECMC alleged that Ms. Peete-Bey owed $13,322.90 in principal, interest, and projected collection costs. See Exhibit 8, "Notice Prior to Wage Withholding."

41. In 2011, Ms. Peete-Bey was earning a stable income. ECMC began aggressively calling Ms. Peete-Bey. When she said she would not pay them what seemed to be a high amount, that she had dropped out, and also needed her wages to support her twin pre-teen sons, a representative from ECMC informed her that they did not want to know why, but rather when she was going to pay.

42. On or about November 10, 2011, ECMC sent Ms. Peete-Bey's employer an Order of Withholding from Earnings and instructed them to garnish her wages.

43. On or about November 28, 2011, Ms. Peete-Bey sent ECMC a hardship letter, in which she explained she had dropped out of PSI and did not believe she owed the debt. *See* Exhibit 9, "Peete-Bey Letter #1."

44. On or about November 29, 2011, ECMC responded by communicating that she owed the debt, and instructed her to check the National Student Loan Database (NSLDS) for "all federal student loan information."

45. When Ms. Peete-Bey checked the NSLDS website, she discovered that ECMC had only reported two of the four disbursements: Loan #04 and Loan #05, totaling $3,312, both of which had been disbursed after her dropout date.

46. In 2012, ECMC intercepted Ms. Peete-Bey's tax returns and garnished her wages.

47. On or about August 3, 2012, following an unfavorable result in an Administrative Wage Garnishment Hearing that ECMC conducted without Ms. Peete-Bey, Ms. Peete-Bey wrote to ECMC and asked for another review of her file. She pleaded with them to stop garnishing her wages because she had financial problems and needed her wages to support her young twin sons. In this letter, she writes that she is depressed and suicidal as a result of ECMC's actions. *See* Exhibit 10, "Peete-Bey Letter #2."

48. On or about April 9, 2013, Ms. Peete-Bey first discovered the court case and fraud involving Irwin Mautner and PSI. She wrote to ECMC and pleaded with them to stop their debt collection efforts and reinvestigate her accounts. *See* Exhibit 11 "Peete-Bey Letter #3."

49. In conversations with Ms. Peete-Bey's counsel, ECMC representatives communicated that they had knowledge of the PSI frauds.

50. Upon learning about the PSI fraud, Ms. Peete-Bey sought legal assistance and, on June 20, 2013, submitted an unpaid refund application, along with a cover letter and ten exhibits (including the PSI case, Affidavit of Dropout date, and MHEC records). *See* Exhibit 12, "Loan Discharge Application: Unpaid Refund."

51. ECMC denied the refund application, but returned one of Ms. Peete-Bey's exhibits that she had submitted to ECMC as proof of the refund that PSI allegedly applied to Ms. Peete-Bey's account in the amount of $1,662.91.

52. Upon information and belief, ECMC has not explained how the latent discovery of this refund affected Ms. Peete-Bey's original balance.

53. Between July 2013 and December 2013, counsel for Ms. Peete-Bey sent two more letters on her behalf with more supporting evidence, requesting that ECMC reconsider the nature of the alleged debt and the unpaid refund application. ECMC rejected the second and third requests.

54. On or about October 25, 2013, counsel for Ms. Peete-Bey also contacted the Ombudsman for the U.S. Department of Education. While counsel never heard back from the U.S. Department of Education, she received a call from ECMC's "Ombudsman," Diane Zitur, on November 21, 2013, who advised counsel that she would ask ECMC to suspend collection activities.

55. The last correspondence rejecting the Peete-Bey unpaid refund application and request for reconsideration from ECMC is dated December 13, 2013. *See* Exhibit 6.

56. On or about January 8, 2014, ECMC sent Ms. Peete-Bey a letter, stating that it had advised the IRS that it would not offset her taxes. *See* Exhibit 13, "1/8/14 IRS Letter from ECMC."

57. On April 4, 2014, ECMC proceeded to offset Ms. Peete-Bey's taxes, collecting approximately $4,700.

58. On or about April 8, 2014, ECMC sent a letter identical to the January 8, 2013 letter, again stating that it would not offset her taxes. *See* Exhibit 14, "4/8/14 IRS Letter from ECMC."

59. Between January 8, 2014, and April 8, 2014, ECMC did not send Ms. Peete-Bey any other letters.

60. On or about April 4, 2014, when Ms. Peete-Bey contacted the IRS to see if there had been a mistake, the representative she spoke to had no knowledge of the suspension of offset.

61. On or about April 4, 2014, when Ms. Peete-Bey contacted ECMC to see if there had been a mistake, she received oral and written communications advising her that her tax return was accepted as payment in full on her student loans. *See* Exhibit 15, "5/2/14 Paid-In-Full Letter from ECMC."

62. Between 2006 and 2013, ECMC collected $9,651.91 in offsets and wage garnishments. In 2014, ECMC collected the additional $4,700 via federal

income tax offset. In total, ECMC has taken over $14,000 from Ms. Peete-Bey via wage garnishments and offsets.

63. Upon information and belief, while garnishing Ms. Peete-Bey's wages, ECMC collected social security monies, therefore depleting Ms. Peete-Bey's future Social Security earnings.

64. To date, ECMC has collected over $14,000 in alleged student loan debts for an education Ms. Peete-Bey never received.

65. Ms. Peete-Bey has suffered from stress, mental anguish, suicidal thoughts, depression, loss of finances, loss of wages, loss of social security retirement income, and humiliation as a result of ECMC's actions.

## COUNT I

### CONVERSION AND CIVIL THEFT

66. The Plaintiff incorporates by reference the foregoing allegations of this Complaint.

67. The Plaintiff stopped attending PSI in November of 1989, and was therefore not responsible for the full amount of the student loans that PSI continued to take out in her name.

68. Defendant ECMC garnished the Plaintiff's wages and offset her tax returns to pay a debt that the Plaintiff did not owe.

69. Defendant ECMC knew about the PSI fraud and misrepresentations, and continued to take Ms. Peete-Bey's tax returns and wages.

70. Defendant ECMC's seizure of Ms. Peete-Bey's tax returns and wages constitutes willful conversion and civil theft.

71. As a direct consequence of ECMC's acts, practices, and conduct, Ms. Peete-Bey lost her wages and tax returns, was humiliated and greatly embarrassed, suffered inconvenience, emotional distress, anxiety, suicidal thoughts, loss of sleep, and incurred other losses and damages.

72. ECMC acted with actual malice or reckless disregard towards Ms. Peete-Bey, in willful, wanton disregard of her interests, in pursuit of ECMC's own financial interests.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in her favor, against ECMC, for compensatory damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000) and punitive damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000) and grant Ms. Peete-Bey such other relief as the Court deems proper.

### COUNT II

#### VIOLATION OF THE MD. CONSUMER DEBT COLLECTION ACT
#### Md. Code Ann., Com. Law § 14-201 et. seq.

73. Plaintiff incorporates the foregoing paragraphs.

74. Plaintiff incurred a debt, which was primarily for personal, family, or household purposes, and it is therefore a "consumer transaction" as that term is defined by the MCDCA § 14-201 (c).

75. Defendant ECMC is a "collector" within the meaning of the MCDCA § 14-201(b).

76. The Defendant's actions to garnish her wages and offset her tax returns for student loans she did not owe constitute an attempt to collect a debt with knowledge that the right to collect the debt does not exist, in violation of the MCDCA § 14-201(8).

77. Defendant ECMC further violated MCDCA § 14-201(3) by disclosing information which affects the Plaintiff's credit worthiness with knowledge that the information was false.

78. Defendant ECMC violated MCDCA § 14-201(6) by pursuing Ms. Peete-Bey's debt for over eighteen years when the right to collect it did not exist.

79. Pursuant to MCDCA § 14-203, a collector who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury.

80. The Plaintiff has been damaged by the Defendant's wrongful debt collection methods.

WHEREFORE, Plaintiff respectfully requests the Court enter judgment in favor of Plaintiff and against Defendant for actual and emotional damages in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000), interest and costs, attorney's fees, and such other relief as the nature of the case may require.

## COUNT III

### VIOLATION OF THE MD. CONSUMER PROTECTION ACT
### Md. Code Ann., Com. Law § 13-101 et. seq.

81. Plaintiff incorporates the foregoing paragraphs.

82. The Defendant's actions in violation of the Maryland Consumer Debt Collection Act constitute unfair or deceptive trade practices in violation of MCPA § 13-101(14)(iii).

83. The Defendant sought to collect an invalid debt based on PSI's false or misleading written statements, which had the capacity, tendency or effect of deceiving or misleading consumers. This violates § 13-101 (1) of the MCPA.

84. By informing the Plaintiff that ECMC would not offset her 2013 federal income tax return and then intercepting it anyway, and then again informing the Plaintiff that ECMC would not offset her tax returns, ECMC made misleading written statements, which had the capacity, tendency or effect of deceiving or misleading consumers in violation of § 13-101 (1) of the MCPA.

85. By failing to disclose that PSI's CEO, Irwin Mautner, had pled guilty to fraudulently altering student records, the Defendant made material omissions that deceived the Plaintiff into believing she had to pay for fraudulent student loans. This violates § 13-101 (3) of the MCPA.

86. By informing the Plaintiff that ECMC would not offset her 2013 federal income tax return and then intercepting it anyway, and then again informing the Plaintiff that ECMC would not offset her tax returns, ECMC made

misleading written statements, which had the capacity, tendency or effect of deceiving or misleading consumers, in violation of § 13-101 (1) of the MCPA.

87. The Defendant's method of using administrative offsets and wage garnishments to collect a fraudulent for-profit trade school debt is an unfair and deceptive trade practice in violation of MCPA § 13-101.

WHEREFORE, Plaintiff respectfully requests the Court to enter judgment in favor of Plaintiff and against Defendant for actual damages and losses (including economic and non-economic) in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000) award reasonable attorney's fees, litigation expenses and costs, and grant the Plaintiff such other and further relief as this Court finds necessary and proper.

Respectfully Submitted,

Jane Santoni
Kathleen P. Hyland
Williams & Santoni, LLP
401 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 938-8666
(410) 938-8668 (fax)

*Attorneys for Plaintiff*

## REQUEST FOR A TRIAL BY JURY

Plaintiff requests a trial by jury of any claims that may be determined by a jury.

Dated: November 14, 2014

*(signature)*
Kathleen P. Hyland
Williams & Santoni, LLP
401 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 938-8666
(410) 938-8668 (fax)

*Attorneys for Plaintiff*