## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JANICE PEETE-BEY                 :
                                   :
                                     :
         v.                            :    Civil No. CCB-15-272
                                     :
                                     :
EDUCATIONAL CREDIT           :
MANAGEMENT CORP.             :

## MEMORANDUM

Janice Peete-Bey sues Educational Credit Management Corp. ("ECMC"), alleging that it wrongfully collected educational debt Peete-Bey assumed nearly two and a half decades ago. Specifically, she alleges conversion, violations of Maryland's Consumer Debt Collection Act ("MCDCA"), and violations of the Maryland Consumer Protection Act ("MCPA"). ECMC has moved to dismiss her complaint, arguing that it is preempted by the Higher Education Act ("HEA"), that it is untimely, and that it does not state a claim under either the MCDCA or the MCPA. That motion has been fully briefed, and no hearing is necessary to its resolution. *See* Local Rule 105.6 (D. Md. 2014). For the reasons explained below, that motion will be granted in part and denied in part.

## BACKGROUND

In her amended complaint, Peete-Bey explains that the PSI Institute ("PSI") "was a for-profit vocational training program that offered computer and data entry skills." (Am. Compl. ¶ 3, ECF No. 13.) In the summer of 1989, Peete-Bey enrolled part-time in classes at PSI, which she financed via student loans issued by Crestar Bank. (*See id.* at ¶¶ 7–9.) Specifically, Peete-Bey secured $6,625 in Stafford and Supplemental loans, plus an additional $1,725 in Pell grants.

(*See id.* ¶¶ 19, 26.)  The total value of those loans exceeded her tuition costs by $2,480.  (*See id.* at ¶ 28.)

Although Peete-Bey signed up for approximately eight months of classes, she alleges that she quit her studies after roughly two months.  (*See id.* at ¶¶ 10–11.)  That allegation is contradicted by the transcript she appends to her complaint, which indicates that her course work began on September 11, 1989, and that she last attended class on March 28, 1990.  (*See* Compl. Ex. 2, ECF No.)  In any case, under PSI's refund policy, Peete-Bey should have been eligible for a refund of 60% of her tuition if she dropped out before completing her course work.  (*See id.* at ¶ 16.)  PSI refunded only $1,662.91 of tuition to Crestar on May 1, 1990.  (*See id.* at ¶ 29.)  All but $1,313 of Peete-Bey's loans were disbursed months after she allegedly stopped attending classes at PSI.  (*See id.* at ¶¶ 19, 27.)

The Maryland Higher Education Loan Corporation ("MHELC") originally guaranteed Peete-Bey's Stafford and Supplemental loans.  (*See id.* at ¶ 26.)  When Peete-Bey defaulted on those loans, MHELC paid default claims to Crestar.  (*See id.* at ¶ 31.)  MHELC later transferred those loans to the United Student Aid Funds ("USAF") in 1995.  (*See id.* at ¶ 31.)  USAF, in turn, transferred the loans again, this time to the Department of Education, which collected roughly $852.63 from Peete-Bey between 1995 and 1998.  (*See id.*)  In early 1998, after Peete-Bey declared bankruptcy,[1] the Department of Education transferred her loans to ECMC.  (*See id.* at ¶ 32.)  At that time, Peete-Bey's outstanding balance amounted to $5,640.45.  (*See id.*)

Peete-Bey alleges that she had no knowledge of these outstanding student loans until 2000.  (*See id.* at ¶ 35.)  Although the Department of Education had collected funds from her between 1995 and 1998, she explains that she "had garnishments for other debts, and did not

---

[1] That bankruptcy was never approved.  (*See id.* at ¶ 33.)

know that the student loan collectors were also potentially garnishing her accounts." (*Id.*)  In 2000, however, ECMC wrote Peete-Bey, explaining that she owed principal, interest, and collection fees on her outstanding loans.  (*See id.* at ¶ 36.)

In 2004, Peete-Bay successfully filed for bankruptcy.  (*See id.* at ¶ 37.)  At that time, an ECMC representative informed her via phone that she remained responsible for her student loans.  (*See id.*)  Beginning in 2006 and continuing through the following year, ECMC offset Peete-Bey's federal tax returns and garnished her wages.  (*See id.* at ¶ 38.)  It engaged in no further collection efforts for the next four years.  (*See id.* at ¶ 39.)  In late 2011, however, "ECMC began aggressively calling Ms. Peete-Bey," stating that her total outstanding balance had risen to $13,322.90.  (*Id.* at ¶ 41; *see also id.* at ¶ 40.)  When ECMC attempted to garnish Peete-Bey's wages, Peete-Bey resisted, explaining that she had dropped out of PSI.  (*See id.* at ¶¶ 42–44.)  The following year, ECMC offset Peete-Bey's tax returns and garnished her wages. (*See id.* at ¶ 46.)

At some point in 2012, ECMC conducted an administrative wage garnishment hearing outside of Peete-Bey's presence.  (*See id.* at ¶ 47.)  Peete-Bey asked for reconsideration.  (*See id.* at ¶ 47.)  The next year, she learned that PSI's former CEO, Irwin Mautner, had been convicted of fraud in 1993 for misreporting student dropout rates to maintain PSI's accreditation and its students' eligibility for financial aid.  (*See id.* at ¶¶ 24, 48.)  She then sought legal counsel, who filed on her behalf an unpaid refund application with ECMC.  (*See id.* at ¶ 50.)  In conversations with Peete-Bey's attorney, ECMC indicated that it knew of Mautner's fraud conviction.  (*See id.* at ¶ 49.)  ECMC denied Peete-Bey's refund application.  (*See id.* at ¶ 51.)  And ECMC twice reconsidered that application at Peete-Bey's request, affirming its prior denial each time.  (*See id.*

at ¶ 43.)

In 2014, ECMC collected roughly $4,700 from Peete-Bey's federal taxes returns, despite assuring her that it would not seek to do so.  (*See id.* at ¶¶ 55–56.)  That collection, combined with previous tax return offsets and wage garnishments, brought ECMC's aggregate collection from Peete-Bey to over $14,000.  (*See id.* at ¶ 62.)  It then informed Peete-Bey that she had satisfied her outstanding debt.  (*See id.* at ¶ 61.)

Peete-Bey filed this lawsuit in the Circuit Court for Baltimore City in late 2014.  (*See* Compl., ECF No. 2.)  She alleges conversion, as well as violations of the MCDCA and the MCPA.  ECMC removed the case to this court.  (*See* Notice of Removal, ECF No. 1.)  After ECMC moved to dismiss her complaint, Peete-Bey filed an amended complaint.[2]  This motion followed.

## ANALYSIS

### I. Standard of Review

When ruling on a motion under Rule 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints."  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not

---

[2] Peete-Bey's filing of an amended complaint moots that initial motion to dismiss.  (*See* ECF No. 11.)  It will accordingly be denied.

4

sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d

435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a

motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal

citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to

prove the elements of the claim.  However, the complaint must allege sufficient facts to establish

those elements." *Walters*, 684 F.3d at 439 (citation omitted).  "Thus, while a plaintiff does not

need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must

advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting

*Twombly*, 550 U.S. at 570).  In considering a Rule 12(b)(6) motion, the court does not always

have to limit its review to the pleadings.  It can also take judicial notice of public records,

including statutes, and can "consider documents incorporated into the complaint by reference, as

well as those attached to the motion to dismiss, so long as they are integral to the complaint and

authentic." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131,

136 (4th Cir. 2014) (citations and internal quotation marks omitted).

## II. HEA Preemption

ECMC first argues that Peete-Bey's state law claims are entirely preempted by the

Higher Education Act and its implementing regulations, which command "guaranty agencies" to

vigorously collect certain educational debts.  Because ECMC may not have acted as a guaranty

agency in collecting Peete-Bey's debt, however, the court declines to dismiss her claims on the

basis of preemption.

5

"The Higher Education Act (HEA) of 1965, now codified at 20 U.S.C. §§ 1001–1155, was passed 'to keep the college door open to students of ability, regardless of socioeconomic background.'" *Chae v. SLM Corp.*, 593 F.3d 936, 938 (9th Cir. 2010) (quoting *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1030 (9th Cir. 2009)).  To that end, Congress established "a system of loan guarantees meant to encourage lenders to loan money to students and their parents on favorable terms."  *Id.*  Within that system, "private lenders . . . utilize their own funds to make loans to students attending post-secondary institutions and to the parents of such students.  These loans are guaranteed by state or non-profit entities known as guaranty agencies, which are reinsured by the federal government."  *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 590 (4th Cir. 2005) (internal citations omitted).  "Because the United States guarantees these loans, the Secretary of Education has an interest in protecting the United States against the risk of unreasonable loss by ensuring that lenders employ due diligence in the collection of these loans."  *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004).

The Secretary of the Department of Education has issued regulations codifying certain due diligence requirements, *see, e.g.*, 34 C.F.R. § 682.410–682.411, pursuant to its statutory authority, 20 U.S.C. § 1082(a)(1).  After a borrower defaults, the lender must undertake a series of collection efforts prescribed by those regulations.  *See* 34 C.F.R. § 682.411(a).  If those "due diligence" efforts fail to secure repayment, then the lender assigns the loan to the guaranty agency, which pays the lender for any outstanding balance on the debt.  *See* 34 C.F.R. §§ 682.102(g), 682.410(b)(5)(vi)(A), 682.412(e)(2).  The guaranty agency, in turn, may seek compensation for some or all of its losses from the Department of Education.  *See, e.g.*, 20 U.S.C. § 1078(c).  But the Department of Education conditions any such reimbursement on the

6

guaranty agency's completion of a prescribed set of "due diligence" activities designed to collect

from the borrower the unpaid balance.  *See* 34 C.F.R. §§ 682.410(b), 682.413(b)(2).  Among

other due diligence obligations, a guaranty agency must report certain defaults to consumer

credit reporting agencies and attempt to offset debtors' federal income tax refunds and garnish

their wages.  *See* 34 C.F.R. § 682.410(b)(5)–(6).  If the guaranty agency's efforts are

unsuccessful, then the loan must be assigned to the Department of Education.  *See* 34 C.F.R. §

682.409(a).  Such an assignment "releases all [the guaranty agency's] rights and title to that

loan."  34 C.F.R. § 682.409(b)(1).

    Pursuant to Congress' power under the Supremacy Clause, "[t]he HEA is riddled with

isolated preemptive provisions that expressly preempt certain provisions of state law."  *Cliff*, 363

F.3d at 1124–25.  Among those provisions is a section authorizing a guaranty agency to garnish

the wages of a debtor, "[n]otwithstanding any provision of State law."  20 U.S.C. § 1095a(a).

And the Secretary has augmented the preemptive scope of the HEA via a regulation precluding

enforcement of "any State law, including State statutes, regulations, or rules, that would conflict

with or hinder satisfaction of" certain due diligence obligations imposed by regulation on

guaranty agencies.  34 C.F.R. § 682.410(b)(8).[3]  That latter regulation appears to codify a

somewhat relaxed variant of the doctrine of implied conflict preemption, which forbids

enforcement of state law "where 'compliance with both state and federal law is impossible,' or

where 'the state law stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress.'"  *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595

---

[3] "'[A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law." *City of New York v. FCC*, 486 U.S. 57, 63–64 (1988) (quoting *La. Pub. Serv. Comm'n v. FCC*, 576 U.S. 355, 369 (1986)).  The parties do not dispute that the Secretary issued that preemptive regulation pursuant to its delegated authority.

(2015) (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)).  In each of these instances, preemption enables guaranty agencies to undertake the due diligence efforts mandated by statute and regulation without fear of liability under state law.

As noted, ECMC invokes those preemption provisions here, arguing that they preclude Peete-Bey's claims.  That argument assumes that ECMC operated as a guaranty agency when it collected her debt.  Indeed, ECMC is a guaranty agency, as other courts have recognized, and it often exercises the powers that flow from that status.  *See, e.g.*, *Bennett v. Premiere Credit of N. Am., LLC*, 504 F. App'x 872, 877 (11th Cir. 2013) (collecting cases).[4]  Here, however, Peete-Bey contests ECMC's authority to operate as a guarantor of *her* loan.  For support, Peete-Bey emphasizes that ECMC received her loans via an assignment from the Department of Education. (*See* Opp. Mot. Dismiss 4–5.)  As she alleges in her complaint, the Department of Education executed that assignment "because Ms. Peete-Bey filed for bankruptcy."  (Am. Compl. ¶ 32.)

Federal preemption is an affirmative defense, on which ECMC carries the burden of proof.  *See, e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010) ("Preemption is an affirmative defense . . . .")*; Pinney v. Nokia, Inc.*, 402 F.3d 430, 446 (4th Cir. 2005) (referring to "the affirmative defense of federal preemption").  Despite that burden, ECMC cites no authority confirming that the Department of Education's assignment of a bankrupt debtor's defaulted loan entitles the receiving entity to exercise its powers as a guaranty agency as to that loan.  Instead, it relies on *Rowe v. Educational Credit Management Corp.*, 730 F. Supp. 2d 1285, 1289–90 (D.

---

[4] In her complaint, Peete-Bey alleges that "ECMC is a federal guaranty agency with many state offices . . . ."  (*See* Am. Compl. ¶ 2.)  ECMC suggests that this allegation constitutes a concession that ECMC acted in that capacity when it collected Peete-Bey's debt.  Not so.  On a motion to dismiss, all reasonable inferences are drawn in the plaintiff's favor.  *See, e.g.*, *Ibarra*, 120 F.3d at 474.  Here, Peete-Bey's use of the indefinite article—describing ECMC as "*a* federal guaranty agency," among many others—implies only the widely known fact that ECMC often acts as a guarantor.  It does not suggest that ECMC qualified as the guaranty agency for her loan, let alone that ECMC acted in that capacity when collecting her debt.

Or. 2010), which held that ECMC operated as a guaranty agency when *another guaranty agency* assigned it the defaulted loans of a debtor seeking discharge in bankruptcy. *Rowe*'s holding is consistent with the HEA and its implementing regulations, which expressly contemplate the assignment of loans between guaranty agencies. *See, e.g.*, 34 C.F.R. § 682.401(b)(8)–(9). But that holding does not suggest—let alone compel—the conclusion that an entity wields the authority of a guaranty agency on a loan that the Department of Education has already received via assignment and subsequently assigned to a third party that sometimes operates as a guaranty agency.[5]

Indeed, the HEA regulations appear inconsistent with that conclusion. As noted, the assignment of a loan to the Department of Education extinguishes a guaranty agency's "rights and title to that loan." 34 C.F.R. § 682.409(b)(1). Under those circumstances, the guaranty agency's function is at an end and, having assumed the loan's unpaid balance, the Department of Education itself pursues the debtor. Any subsequent assignment of that loan to a third-party— here, ECMC—would seem to be little more than a contract for debt collection. *See* 31 C.F.R. § 901.5 (authorizing federal agencies to contract with private collection contractors); *see also* 34 C.F.R. § 30.1(a)–(b). There is no obvious reason to conclude that such an assignment carries with it the obligations or authority of a guaranty agency under the HEA. If there is some

---

[5] In this regard, it is not pertinent that in *Rowe* the Department of Education directed ECMC to receive assignments from the previous guarantor. *See Rowe*, 730 F. Supp. 2d at 1288. The Department of Education did so only after termination of the previous guarantor's status as a guaranty agency. *See id.* Following such a termination, the HEA permits the Department of Education to "assume responsibility for all functions of the guaranty agency." 20 U.S.C. § 1078(c)(9)(F). Having done so, the Department may, among many other options, "transfer [the terminated guarantor's] guarantees to another guaranty agency" or "transfer [those] guarantees to the Department of Education." 20 U.S.C. § 1078(c)(9)(F)(i), (iii). In *Rowe*, the Department seemingly elected to pursue the former option rather than transferring those guarantees to itself. In other words, the Department of Education never received the loan via assignment.

statutory, regulatory, or contractual basis for such a conclusion, ECMC has not carried its burden of presenting that reason to the court.[6]

ECMC's failure to support its argument with adequate legal authority is especially significant where, as here, it seeks to preclude the enforcement of state consumer protection laws. "When addressing questions of express or implied pre-emption, [courts] begin [their] analysis 'with the assumption that the historic police powers of the State [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (last alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 3312 U.S. 218, 230 (1947)). "[C]onsumer protection is a field traditionally regulated by the states . . . ." *Cliff*, 363 F.3d at 1125. In that context, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Grp.*, 55 U.S. at 543 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)). Those observations counsel a narrow understanding of the scope of a guaranty agency's authority when a putative guarantor invokes that authority to preempt state law.

Given the allegations and arguments before the court, there is no reason to believe that ECMC operated as a guaranty agency when it collected Peete-Bey's debt. ECMC may well be able to prove that status at some later phase of the proceedings, whether with sufficient facts or adequate legal argument. For now, however, it cannot invoke preemption premised on a status it has not proven.

---

[6] In a declaration appended to its motion to dismiss, an ECMC employee asserts that the Department of Education's assignment of Peete-Bey's loans "included ECMC assuming all of the responsibility of a guarantor of Plaintiff's student loans." (Mot. Dismiss, Klisch Decl. ¶ 5, ECF No. 14-6.) To the extent ECMC offers that conclusory statement as proof of the nature of the contract between ECMC and the Department of Education, it is not cognizable on a motion to dismiss.

## II. Failure to State a Claim

ECMC asserts that Peete-Bey has not alleged sufficient facts to state a claim under either the MCDCA or the MCPA.  On the basis of those arguments, the court will dismiss most of Peete-Bey's claims under the MCDCA and all of her claims under the MCPA.

### A. MCDCA Claims

"The MCDCA 'protects consumers against certain threatening and underhanded methods used by debt collectors in attempting to recover on delinquent accounts.'"  *Stewart v. Bierman*, 859 F. Supp. 2d 754, 769 (D. Md. 2012) (quoting *Shah v. Collecto, Inc.*, DKC-04-4059, 2005 WL 2216242, at *10 (D. Md. Sept. 12, 2005)).  Among other such practices, it prohibits "communicat[ion] with the debtor . . . with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor;" the disclosure of information that "affects the debtor's reputation for credit worthiness with knowledge that the information is false;" and any "claim, attempt, or threat[] to enforce a right with knowledge that the right does not exist."  *See* Md. Code Ann., Com. Law § 14-202(3), (6), (8).  Peete-Bey alleges violations of those latter two prohibitions on the ground that ECMC knew of the invalidity of her underlying debt.  (*See* Am. Compl. ¶¶ 76–78.)  To make out such a claim, Peete-Bey must "allege that [ECMC] acted with knowledge as to the *invalidity* of the debt."  *Stewart*, 859 F. Supp. 2d at 769.[7]  Those allegations must plausibly suggest that ECMC acted with either "actual knowledge or reckless disregard as to" the invalidity of the debt.  *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F. Supp. 2d 492, 511 (D. Md. 2004).

---

[7] *Stewart* and the cases on which it relies may be in some tension with *Fontell v. Hassett*, 870 F. Supp. 2d 395 (D. Md. 2012).  That latter decision held that the MCDCA "provides no basis for liability in contesting the underlying debt." *Id.* at 406.  Instead, *Fontell* concluded that the MCDCA "proscrib[es] certain *methods* of debt collection rather than the debt itself." *Id.* at 405.  ECMC does not argue that interpretation of the MCDCA.  Accordingly, the court need not—and does not—attempt to resolve any possible tension in this court's case law.

ECMC contests these claims on the ground that Peete-Bey has not alleged facts plausibly showing that ECMC knew of the invalidity of her debt.[8]  Her sole allegation as to knowledge pertains to ECMC's acknowledgment that it "knew about the PSI fraud and misrepresentations, and continued to take Ms. Peete-Bey's tax returns and wages."  (Am. Compl. ¶ 69; *see also* ¶ 49.)  But knowledge that Mautner generally committed fraud at PSI does not imply that PSI defrauded Peete-Bey in particular.  At most, it implies that ECMC should have evaluated her debt with a greater measure of care, and thus might have recklessly disregarded the possibility of error in failing to do so.  As ECMC points out, however, Peete-Bey also alleges that she submitted, with the help of counsel, an unpaid refund application, which ECMC evaluated and denied.  Indeed, on Peete-Bey's request, ECMC twice reconsidered that application, affirming its prior denial each time.  (*See id.* at ¶ 43.)  Importantly, Peete-Bey neither argues nor alleges that ECMC's consideration of her application was inadequate, let alone that ECMC was recklessly indifferent to its potential merits.  Absent such an allegation, it is not plausible that ECMC either knew that Peete-Bey was due a partial refund on her student debt or that it was recklessly indifferent to that possibility in light of its investigation of her refund claim.

Peete-Bey retorts that the MCDCA is less tolerant of a defendant's ignorance of the law than of the facts.  True, "the term 'knowledge' in the Act does not immunize debt collectors from liability for mistakes of law."  *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 732 (D. Md. 2011).  But that observation will not save Peete-Bey's claims.  At best, it responds to ECMC's suggestion that its status as a guaranty agency renders conclusive its denial of Peete-

---

[8] She also alleges violation of the MCDCA's prohibition on abusive communication.  As she puts it in her complaint, ECMC violated that prohibition "by pursuing Ms. Peete-Bey's debt for over eighteen years when the right to collect it did not exist."  (Am. Compl. ¶ 78.)  That provision does not expressly require knowledge, and so falls outside the scope of ECMC's objection to her complaint.

Bey's unpaid refund application.  That argument is premised on the still-unproven assumption that ECMC qualified as a guaranty agency when collecting Peete-Bey's debt.  But even if that legal assumption is ultimately mistaken, ECMC's error would not suggest any knowledge of the factual predicates of Peete-Bey's allegation that PSI owed her a refund.

Accordingly, Peete-Bey's claim that ECMC violated the MCDCA's prohibitions on disclosure of false information and attempting to enforce a right with knowledge it does not dismiss will be dismissed for failure to state a claim.

**B. MCPA Claims**

The MCPA prohibits certain deceptive trade practices, including representations that "ha[ve] the capacity, tendency, or effect of deceiving or misleading consumers" and omissions of "material fact if the failure deceives or tends to deceive."  Md. Code Ann., Com. Law § 13-301(1), (3).  Peete-Bey alleges a host of violations of those proscriptions, each of which ECMC contests.  "To state a claim under the MCPA, plaintiffs must adequately allege '(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury.'"  *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. MD. 2013) (quoting *Stewart*, 950 F. Supp. 2d at 768).  "To establish reliance under the MCPA, Plaintiffs must plead and prove that the false or misleading statement substantially induced their choice."  *Id.* at 798.  "The requirement of reliance flows from the MCPA's prescription that the party's 'injury or loss' be 'the result of' the prohibited practice . . . ."  *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 534 (D. Md. 2011).

Peete-Bey first asserts that ECMC's efforts "to collect an invalid debt *based on PSI's false or misleading written statements* . . . had the capacity, tendency or effect of deceiving or

misleading consumers." (Am. Compl. ¶ 86 (emphasis added).) Relatedly, she alleges that

offsetting her tax returns and garnishing her wages "to collect a fraudulent for-profit trade school

debt is an unfair or deceptive trade practice," and that ECMC's failure to inform her of

Mautner's fraud conviction constituted a deceptive omission. (*Id.* at ¶¶ 88–89.) Those

allegations are seemingly premised on PSI's fraud, not ECMC's deception. As Peete-Bey

explains in her opposition, she alleges that ECMC's conduct was "false and deceptive because

[it] demanded payments on an invalid debt." (Opp. Mot. Dismiss 29.) Peete-Bey cites no

authority suggesting that Maryland courts would recognize such a cause of action, and

independent research has netted none. But even if such a representation constitutes a deceptive

trade practice under Maryland law—which the court does not decide—then Peete-Bey's claim

would still fail for want of any allegation that she relied on ECMC's representations to her

detriment. After all, Peete-Bey does not allege that she voluntarily paid her debt in acquiescence

to ECMC's representations. To the contrary, she resisted those efforts.

Peete-Bey next alleges that ECMC deceived her by falsely representing that it would not

offset her 2013 federal income tax return. (*See* Am. Compl. ¶ 87.) She alleges that ECMC sent

her two identical letters—one in early January 2014, the other in early April of that year—

"stating that it had advised the IRS that it would not offset her taxes." (*Id.* at ¶ 56; *see also id.* at

¶ 58.) Nevertheless, her federal tax returns were offset on April 4. (*See id.* at ¶ 57.) The letters

appended to Peete-Bey's complaint, however, contradict her characterization of them. Those

letters advised that "there may be some delay before [ECMC's] request for suspension takes

effect, as the Treasury Department must complete a number of steps to implement this request."

(*See* Compl. Exs. 13, 14.) More importantly, the letters explained that, even "if offset action is

suspended on your debt at this time," ECMC "will reinstate the request for offset, *without further notice*, if the circumstances on which this suspension is based change." (*Id.* (emphasis added).) In other words, the letters expressly stated that her tax return may well be offset, notwithstanding ECMC's suspension, either because of the Treasury Department's delay in processing that suspension or because ECMC reinstated its offset request. Even on a motion to dismiss, this court is "not obliged to accept allegations that . . . 'contradict matters properly subject to judicial notice or by exhibit.'" *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)). Accordingly, the court will dismiss Peete-Bey's MCPA claim to the extent it is premised on ECMC's letters advising her of the possible suspension of the tax return offsets.

Last, Peete-Bey brings an MCPA claim premised on her separate allegation that ECMC violated the MCDCA. The MCPA permits such claims. *See* Md. Code Ann., Com. Law § 13-301(14)(iii). But because the court will dismiss the MCDCA allegations on which that MCPA claim is based, it too will be dismissed.

*     *     *

For these reasons, the court will dismiss two of Peete-Bey's three claims under the MCDCA and all of her claims under the MCPA.

### III. Statute of Limitations

Peete-Bey initiated this lawsuit in mid-November 2014. (*See* Compl., ECF No. 2). ECMC argues that she filed her complaint too late, after the statute of limitation has run on all her claims. Having dismissed most of Peete-Bey's MCDCA claims and all of her MCPA claims on separate grounds, the court will analyze the timeliness of only her conversion claim and her

claim that ECMC violated the MCDCA "by pursuing Ms. Peete-Bey's debt for over eighteen years when the right to collect it did not exist." (Am. Compl. ¶ 78.)

"[C]onversion claims are governed by Md. Code § 5-101 of the Courts and Judicial Proceedings Article . . . , which provides that '[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.'" *Llanten v. Cedar Ridge Counseling Ctrs., LLC*, 75 A.3d 1030, 1034 (Md. Ct. Spec. App. 2013). "Generally, a claim accrues when the plaintiff suffers the actionable harm." *Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 109 A.3d 639, 658 (Md. 2015). Because a harm is not actionable until each element of the asserted tort arises, "[t]he law is concerned with accrual in the sense of testing whether all of the *elements* of a cause of action have occurred so that it is complete." *Kumar v. Dhanda*, 43 A.3d 1029, 1034 (Md. 2012) (alteration in original) (quoting *St. Paul Travelers v. Millstone*, 987 A.2d 116, 121 (Md. 2010)). Peete-Bey premises her conversion claim on the allegedly wrongful seizure of her tax returns and wages. (*See* Am. Compl. ¶ 70.) Those seizures were wrongful, she alleges, because she did not owe the full value of the debt in light of PSI's failure to issue her a refund. (*See id.* at ¶¶ 67–69.)

ECMC first argues that this conversion claim is barred on the ground that Peete-Bey's "right to a refund, if any, accrued in 1989 or 1990, when she left PSI." (Mot. Dismiss 19.) That argument misconstrues the nature of the wrong Peete-Bey alleges. "A defendant converts a plaintiff's personal property where the defendant intentionally exerts 'ownership or dominion over [the plaintiff]'s personal property in denial of or inconsistent with the [plaintiff]'s right to [the plaintiff's personal] property.'" *Thompson v. UBS Fin. Servs., Inc.*, 115 A.3d 125, 127 (Md.

2015) (alterations in original) (quoting *Nickens v. Mount Vernon Realty Grp., LLC*, 54 A.3d 742, 756 (Md. 2012)).  Peete-Bey's claim thus remained incomplete until her property was seized. The date on which her alleged right to that property arose via refund is not dispositive.

ECMC next asserts that Peete-Bey's conversion claim accrued in 2006, when ECMC first began offsetting her tax refunds and garnishing her wages.  Notably, however, Peete-Bey alleges that ECMC received no payments on her debt between 2008 and the end of 2011.  (*See* Am. Compl. ¶ 39.)  It resumed its collection efforts only in late 2011, offsetting her tax returns and garnishing her wages in 2012, and offsetting her tax return in 2014.  (*See id.* at ¶¶ 46, 57.)  Those collection efforts appear to constitute distinct seizures.  Pending further development of the record, the court declines to dismiss Peete-Bey's conversion claim to the extent it is premised on seizures that occurred within three years of the filing of her complaint.  To the extent it is based on seizures predating that period, however, it will be dismissed.

As to Peete-Bey's remaining MCDCA claim, "[t]he statute of limitations for filing [such a claim] is three years."  *Kouabo v. Chevy Chase Bank, FSB*, 336 F. Supp. 2d 471, 475 n.4 (D. Md. 2004) (citing Md. Code Ann., Cts. & Jud. Proc. 5-101).  Peete-Bey alleges that ECMC violated the statute's proscription on "[c]ommunicat[ion] with the debtor or person related to him with the frequency, at the unusual hour, or in any other manner as reasonably can be expected to abuse or harass the debtor," Md. Code Ann., Com. Law § 14-202(6), by pursuing her "debt for over eighteen years when the right to collect it did not exist," (Am. Compl. 78.)  That cause of action requires Peete-Bey to prove that ECMC communicated with her in a harassing manner, among other things.  Accordingly, the tort remains incomplete until such a communication occurs.

ECMC argues that Peete-Bey's claim accrued eighteen years ago, when ECMC "first began its attempts to collect on the account." (Mot. Dismiss 20.) But that interpretation ignores the gravamen of her claim, which implies that ECMC's communications were abusive precisely because they persisted for over eighteen years, not that any such communications were abusive at the beginning of that period. Alternatively, it argues that her claim accrued in 2000 and 2004, when Peete-Bey received letters from ECMC. To the extent Peete-Bey's claim is premised on those communications, it is time barred. But to the extent her claim is based on communications within three years of the filing of her claim, it falls within the statute of limitations.

Accordingly, Peete-Bey's conversion claim and remaining MCDCA claim are dismissed only to the extent they are based on seizures or communications that occurred three years before she filed her complaint.

## CONCLUSION

For the reasons stated above, the court will grant in part and deny in part ECMC's motion to dismiss. Most of Peete-Bey's claims under the MCDCA and all of her claims under the MCPA will be dismissed, while her conversion claim and MCDCA communication claim will continue to the extent they are premised on seizures or communications occurring within three years of this lawsuit's initiation.

A separate order follows.


September 14, 2015                                    /S/
Date                                       Catherine C. Blake
                                           United States District Judge


18